SMITH and another, Respondents, vs. WISCONSIN INVEST-
MENT COMPANY, Appellant.

*March 14—April 1, 1902.*

*Replevin: Pleading: Right of possession: Sale of lumber: When title
passes: Lien for advances.*

1. A complaint in replevin stating that plaintiff is the owner of
   the property and entitled to its possession, and that defendant
   has wrongfully taken and unlawfully detains the same, is suf-
   ficient, although it does not allege that plaintiff is entitled to
   the "immediate possession."

2. A contract for the sale of lumber to be sawed thereafter pro-
   vided that it should be piled at the vendor's mill as directed
   by the vendees; that when in shipping condition it should be
   delivered on cars a mile and a half from vendor's mill, and
   should be graded, scaled, and accepted when loaded on the cars;
   and that the value should be credited on indorsements which
   the vendees were to make for the vendor. All culls in excess
   of a certain percentage were to be rejected, and the vendor was
   to hold the lumber free from liens and to pay the taxes. As
   security for the indorsements to be made by the vendees, the
   title and right to possession were to vest in them, the piles were
   to be marked with their initials, and they were to insure the
   lumber at the expense of the vendor. If the lumber was not
   all shipped before the end of the year, the vendees were to
   scale and accept it, or make an approximate estimate, and
   make final settlement. *Held*, that the title to the lumber did
   not pass to the vendees until it was delivered, passed upon, and
   accepted by them.

3. The vendees in such case did not make any indorsements as pro-
   vided for in the contract, but advanced money to the vendor,
   taking his note. The lumber was not piled and marked as con-
   templated in case of indorsements, nor insured by the vendees.
   *Held*, that the contract gave no lien on the undelivered lumber
   for such advancements, and that the vendees could not claim
   it as against a mortgagee of the vendor.

4. An attempt by the vendees to take possession, by marking the
   piles of lumber in the absence of vendor and after he had mort-
   gaged the same, gave the vendees no title and no right to main-
   tain replevin against the mortgagee, whether his mortgage was
   or was not valid.

APPEAL from a judgment of the circuit court for Ashland
county: JOHN K. PARISH, Circuit Judge. *Reversed.*

Replevin of a lot of lumber located at Copper Falls, Ashland county, Wisconsin. The plaintiffs claim to be the owners of the lumber by virtue of a certain contract made with one E. H. Wicks. The latter was the lessee of a sawmill at Copper Falls. During the season of 1899 and 1900 he had put in a quantity of basswood and hemlock logs to be sawed at his mill. Prior to March 19, 1900, he had had some negotiations with plaintiffs as to the sale of the lumber to be cut from his logs. On that day he wrote plaintiffs a letter as follows:

"I inclose you the contract between you and Connor & Krause, of Marshfield, Wisconsin, dated Jan. 9th, 1900, the same being the sale of your hardwood lumber for the coming season; and, as to our agreement, I sell you my lumber, basswood and hardwood, under the same contract, or one in duplicate of it, being worded the same; or, to make it more plain, the Connor & Krause contract is the contract between Smith & Osborn and myself for my hardwood lumber, basswood," etc.

The contract referred to in the letter between Connor & Krause and plaintiffs is quite lengthy, and in substance is as follows: Plaintiffs sell and agree to deliver on cars their entire cut of lumber from certain logs at their mill at Park Falls, with the exception of 500,000 feet of basswood. The lumber was to be cut as the vendees directed, and piled as stipulated. Connor & Krause were to accept, scale, and grade the lumber as it was loaded on the cars, and pay stated prices, mill culls and hearts out. Plaintiffs guarantied the stock should not contain to exceed twenty-five per cent. of shipping culls, and that the balance of the stock should be of a grade of common and better. If there was a larger percentage of shipping culls than stated, they were to be rejected. The sellers were to hold the stock free from liens and pay the taxes. The contract then contained the following clause:

"For the purpose of assisting the party of the first part in the purchase of logs during the coming winter, party of the

second part agree that they will assist the party of the first part in securing money to purchase logs, etc., by indorsing for them; and, in order that the party of the second part may be secured for such indorsements, it is hereby agreed and understood that the right of possession and title to said logs shall be vested in the party of the second part, wherever found. It is also agreed that the party of the second part shall insure said lumber to secure themselves against loss by fire for any indorsements that they may have made, charging against said party of the first part the cost of such insurance. And when said lumber is manufactured and in piles, each pile shall be numbered and marked with the initials of the party of the second part. When the said stock is in shipping condition, the said party of the second part agrees that they will take out said lumber from time to time, and for all shipments that are taken out during any month they will, at the end of said month, credit the proceeds of said shipment, less two per cent. discount for cash, to the account of the party of the first part, applying same to their indorsed paper."

It then contained some stipulation as to scaling up and accepting all that was not shipped by the end of the year 1900, and an agreement by the vendees to assist the other parties by their indorsements to an amount equal to sixty per cent. of the value of the lumber as it was being manufactured.

On March 24, 1900, plaintiffs' gave Wicks a check for $2,000, and charged it to him on their books. At the same time they took Wicks's note for that amount, bearing interest, and thereafter discounted it at the bank, where it was at the time of the trial, unpaid. On October 1, 1900, they gave Wicks $150. During August and September Wicks delivered them lumber of the net value of $751.44. At some later date the plaintiffs received lumber of the net value of $661.84. After charging up interest and certain discounts, the plaintiffs claimed a balance due them from Wicks of $886.56. On October 1, 1900, Wicks was indebted on a note of $1,000 to the Ashland National Bank, then due. On that day he took up the old note and executed a new one, due on demand, and

gave the bank a chattel mortgage covering all the lumber at his mill to secure the same. This mortgage was afterwards assigned to defendant, and under it the company took possession of the lumber.

Plaintiffs brought this action of replevin, alleging ownership, right to the possession, and an unlawful taking and detention by defendant. The defendant denied plaintiffs' title, and alleged that the lumber had been seized under some half dozen writs of attachment against Wicks, and that defendant had taken possession of the lumber under its mortgage, subject to the rights of the officer making the attachments.

Upon the trial the plaintiffs proved their contract, the payment to Wicks as stated, the receipt of a portion of the lumber, that Wicks had left the state, and that about October 15th plaintiffs had marked the remaining piles of lumber with their initials. A motion for a nonsuit was denied. The defendant showed the giving of the mortgage by Wicks and its assignment; that Wicks's lease of the mill did not expire until 1901; that Wicks insured the lumber as his own to the amount of $5,000; that some of the policies were payable to the Ashland National Bank in case of loss; that Wicks gave mortgages and bills of sale of the lumber to various parties; and that the lumber, prior to October 1st, was not marked, except with Wicks's own mark. Defendant also introduced the records in the several attachment cases.

Each party moved for a direction of a verdict. The court granted plaintiffs' motion except upon the question of the value of the property, which was found by the jury. Defendant excepted to the ruling and to the refusal to direct a verdict for defendant. Plaintiffs elected to take judgment for the value of the property. Defendant appeals from the judgment.

For the appellant there were briefs by *Dufur & Alvord,* and oral argument by *John F. Dufur.*

For the respondents there was a brief by *H. C. Peters,* attorney, and *R. Sleight,* of counsel, and oral argument by *Mr. Sleight.*

BARDEEN, J. A preliminary question arises over the sufficiency of the complaint. It is alleged that plaintiffs are the owners and lawfully entitled to the possession of the property described, stating its nature; that defendant wrongfully took possession of and unlawfully detained the same, to plaintiffs' damage. Then follows an allegation of demand and refusal to deliver possession. The criticism is that it is not alleged that plaintiffs are entitled to the *immediate* possession of the property. It is true that there may be instances when the general property may be in one person and the right to immediate possession in another. But when the complaint states that the plaintiff is the owner and entitled to the possession, and that defendant has wrongfully taken and unlawfully detains the property in question, there is no room for any inference of divided ownership and right to possession. See *Oleson v. Merrill,* 20 Wis. 462, which sustains a complaint much less definite in allegation than the one under consideration. It is not unreasonable to assume that where one says that he is the owner of property and entitled to the possession of the same, he is entitled to the *immediate* possession. Any inference that might arise as to the defendant's right of possession is negatived by the allegations of wrongful taking and detention. The statute of Kansas, and probably of other states, requires that the plaintiff shall state that he is entitled to the "immediate possession" of the property sought. *Paul v. Hodges,* 26 Kan. 225. No such provision is in our statute, that we are aware of.

The only question submitted to the jury in this case was as to the value of the property in controversy. The trial court determined the disputed question of title to the lumber in favor of plaintiffs. This can only be justified on the theory

that the title passed under the contract set out in the state-
ment. The question of when title passes under contracts of
sale is one not always easy of solution. Very much depends
upon the wording of the contract, situation of the property,
and the intention of the parties. The chief difficulty in this
case arises in the attempt of the parties to adopt the terms
of the Connor & Krause contract as their contract. The evi-
dence shows that the situation of the vendors in the two con-
tracts was quite different. Under the Connor & Krause
contract the vendees were to assist the vendors by indorse-
ments for the purpose of purchasing logs. Under the con-
tract in suit no such project was in mind. Wicks already had
his logs purchased, and the greater portion of them had been
delivered at the mill when the contract was made. There
were other points of dissimilarity in the situation of the par-
ties not important in this litigation.

The plaintiffs argue that the contract has a twofold aspect,
either of which will sustain the position of the trial court.
In the first place, they claim that the contract shows an exe-
cuted sale of the lumber, the title to which became vested in
plaintiffs before this action was commenced. No such con-
clusion is warranted by the literal terms of the contract. The
lumber was not in existence at the time the contract was
made. It was to be sawed during the ensuing sawing season.
It was to be piled at the sawmill, a mile and a half from place
of delivery. It was to be delivered on board cars, and to be
graded, scaled, and accepted when loaded on cars, and the
value was to be credited on indorsements at the end of each
month upon the basis of the inspection made when loaded.
Wicks was to hold the lumber free from liens and to pay
taxes on the same. Plaintiffs were to assist Wicks in secur-
ing money by indorsements, and the title and right of posses-
sion was to vest in them as security. Plaintiffs were to in-
sure the lumber, and charge the cost to Wicks. In case the
lumber was not all shipped out before the end of the year

1900, the plaintiffs were to scale and accept the stock, less the cost of loading on cars, or make an approximate estimate if it could be agreed upon, and make final settlement. It is perfectly evident that title did not pass at the date of the contract. The whole theory of the contract is inconsistent with that idea. The fact that plaintiffs were to have title and possession as security for indorsements is wholly unreconcilable with the idea that absolute title had become vested in them. A party does not usually take security on his own property. But stronger than this is the fact that the contract plainly contemplates the scaling, grading, delivery, and acceptance of the lumber by plaintiffs before the title should pass. The lumber was to be up to a specified grade, and to contain not to exceed twenty-five per cent. of shipping culls. That grade and the quantity of culls could only be determined by inspection, and all culls exceeding the limit specified were to be rejected and remain the property of Wicks. On the face of the contract, therefore, we say no title to the lumber passed until it was delivered, passed upon, and accepted by the plaintiffs.

We are strengthened in this conclusion by the acts of the parties. Wicks treated the lumber as his own by insuring it and mortgaging it to other parties. Plaintiffs, instead of indorsing for Wicks, as contemplated by the contract, on March 24th gave him a check for $2,000, and charged it to him on their books. On its face this would look like an advance on the sale price of the lumber. But the fact appears that at the same time they took his note for the amount of the check, bearing interest, and later discounted it at the bank, where it was, unpaid, at the time of the trial. In one aspect the transaction was a payment on the lumber, and in another a mere loan. Plaintiffs' agent who conducted the transaction considered it an advancement, and under that theory the other aspect of the transaction advanced by plaintiffs—that the contract may be construed to be a mortgage—falls to the

ground.    Plaintiffs have not brought themselves within the clause of the contract which would give them a lien on the lumber for indorsements.    The lumber was not piled and marked as contemplated in the contract in case indorsements were made.    Plaintiffs did not insure the lumber as they were empowered to do under certain contingencies.    They made no indorsements and assumed no liability to others on behalf of Wicks.    The transaction mentioned is clearly not within the terms of the agreement.    The contract fails to make any provision for a lien for advancements or for loans, and, none having been created by the act or agreement of the parties, the plaintiffs' claim of a mortgage interest is entirely without foundation.

    Whatever view we take of the situation, we are unable to find any solid ground to support the court's conclusion. There was no delivery of the lumber after it was sold.    The attempt of plaintiffs to take possession during Wicks's absence did not help their claim.    They got no title by committing a trespass.    They must stand upon their contract as the basis of their rights.    Had there been a voluntary delivery of the lumber by Wicks to them, then the validity of defendant's mortgage might come in question.    But, not having shown any title or right to possession in themselves, the plaintiffs cannot maintain this action, whether defendant has or has not title.

    The principles of law applicable to the situation here presented have been considered in cases too numerous to be cited. The question whether a sale is completed or only executory, when no question arises under the statute of frauds and the rights of creditors do not intervene, is one to be determined from the intent of the parties as gathered from their contract, the situation of the thing sold, and the circumstances surrounding the sale.

    "When the goods sold are sufficiently designated so that no question can arise as to the thing intended, it is not abso-

lutely essential there should be a delivery, or that the goods should be in a deliverable condition, or that the quantity or quality, when the price depends upon either or both, should be determined. These are circumstances indicating intent, but are not conclusive." *Lingham v. Eggleston,* 27 Mich. 324.

But when anything is to be done by the vendor, or by mutual concurrence of both parties, for ascertaining the price of the goods,—as by weighing, testing, or measuring them,— or, the goods and the price being ascertained, there is something to indicate an intention to postpone the transference of the property till the fulfilment of any specified conditions, the performance of these conditions is presumed to be a condition precedent to a transfer of the property. These conditions may be weighing, measuring, testing, inspecting, delivery, acceptance, or any other deemed necessary by the parties to the identification and severance of the thing sold. One of the tests of the question of title is who should bear the loss in case the property were destroyed. A few of the many cases where the question here involved has been under discussion are here cited: *Sanborn v. Hunt,* 10 Wis. 436; *Galloway v. Week,* 54 Wis. 604, 12 N. W. 10; *Pike v. Vaughn,* 39 Wis. 499; *Thomas v. Tolford,* 70 Wis. 155, 35 N. W. 293; *Lingham v. Eggleston,* 27 Mich. 324; *Hahn v. Fredericks,* 30 Mich. 223. We do not think the transaction in this case amounted to a completed sale, or was attended by any such legal consequence.

*By the Court.*—The judgment is reversed, and the cause is remanded for a new trial.